<u>**NOT FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X
In re:

Lance Farina,                                    Chapter 7
                                                 Case No. 16-21344 (CMG)
             Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - -X
Paul and Donna Christman,              Adv. Pro. No. 16-1691 (CMG)

             Plaintiff,
v.

Lance Farina,

             Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - -X

<u>**OPINION**</u>

**APPEARANCES:**

**WILLIAM S. KATCHEN, ESQ**
**The Law Offices of William S. Katchen, LLC**
Attorneys for Plaintiffs, Paul and Donna Christman

**JOSEPH ALBANESE, ESQ.**
**Law Office of Joseph Albanese**
Attorney for Debtor/Defendant, Lance Farina

<u>**CHRISTINE M. GRAVELLE, U.S.B.J.**</u>

<u>**INTRODUCTION**</u>

Plaintiff Paul Christman ("Christman")[1] prosecutes this adversary proceeding against

debtor/defendant Lance Farina ("Farina") seeking a determination that the debt owed to Christman

---

[1] Mr. Christman's wife, Donna Christman, was also listed as a plaintiff in the action.  She passed away during the pendency of the case.  The Court offers its condolences to Mr. Christman.  Although Mrs. Christman is a named

1

from Farina is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2), (4), and (6); and that Farina

is not entitled to a discharge in his bankruptcy pursuant to 11 U.S.C. § 727(a)(2), (3), and (5).  The

underlying allegations relate to Farina's failure to complete his obligations under a contract with

Christman for construction work on a property located in Long Beach Island, New Jersey ("LBI").

Summarily, the basis for Christman's complaint is that Farina's business[2] was insolvent at the time

the parties entered into the contract and had no ability to complete the work promised.  By not

disclosing the financial problems, Christman posits that Farina fraudulently induced him into

making payments.  Further, Christman argues that the insolvency of Farina's company placed

Farina in the role of fiduciary to the creditors of the company.  Farina's use of the payments made

by Christman for Farina's personal use violated his fiduciary duty.

After a lengthy discovery period followed by numerous days of trial, this Court finds that

Christman has not met his burden and judgment must be entered in favor of Farina on all counts.

Despite the vitriol and hyperbole in Christman's filings, it is apparent that Farina is exactly the

type of honest but unfortunate debtor for whom the Bankruptcy Code exists.  His inability to

complete the work on Christman's property was not the result of any intentional malicious acts,

but rather a simple case of a sole proprietor struggling to fulfill the terms of his contract while

trying to save the failing business from which he made his living - all during a period of personal

challenges.  Accepting Christman's position would place an untenable burden on sole proprietors

and directly contravene the goals and purposes of the Bankruptcy Code.

---

plaintiff and was a party to the contract and involved in the underlying facts, the Court will refer to Mr. Christman
in the singular for the purpose of clarity.

[2] Documents introduced at trial, including the building contract, invoices issued by Farina, and vendor invoices
issued to Farina, revealed that Farina was associated with a company or companies referred to as L.M. Farina &
Sons, L.M. Farina Custom Building Company, and L.M. Farina & Sons, Inc.  Farina testified that he started Farina &
Sons as a sole proprietorship, then formed an LLC, then formed a subchapter S corporation.

## JURISDICTION

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of Reference from the United States District Court for the District of New Jersey, referring all bankruptcy cases to the bankruptcy court.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I) and (J).  Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.  Pursuant to Fed. R. Bankr. P. 7052, the Court issues the following findings of fact and conclusions of law.

## PROCEDURAL HISTORY

Farina filed a Chapter 7 bankruptcy petition on June 10, 2016.  He listed Christman as an unsecured creditor with an unknown claim amount.  The Chapter 7 trustee issued a Report of No Distribution indicating that Farina's bankruptcy estate had been fully administered and that the trustee had not identified any property available for distribution to creditors.  Christman instituted the present adversary proceeding on September 9, 2016.  Farina filed an answer on October 28, 2016.  Over the next several years, the parties entered into fourteen joint scheduling orders.  The delays were largely due to circumstances beyond the control of the parties and were entered into consensually.  Christman filed a motion for summary judgment on January 21, 2022, which was opposed by Farina.  On April 8, 2022, the motion was denied, and the parties were instructed to prepare for trial.

Trial occurred over five days during a month-long period.  Christman called five witnesses: 1) Farina; 2) Christman; 3) Charles Lunden, CPA ("Lunden"), an expert witness on accounting hired by Christman who produced two expert reports over the course of the litigation; 4) William Brower ("Brower"), introduced as an expert witness on construction and the contractor who

3

finished the work on the Christman property after Farina was terminated; and 5) Diane Falconiero ("Falconiero"), an employee of Universal Supply Company ("Universal Supply"), one of Farina's major suppliers.

Following the trial, the parties engaged in extensive post-trial briefing which concluded in March 2023.[3]  Based upon this record, the Court issues its decision.

## FACTUAL FINDINGS

Farina began working in the building trades in the early 1990s, becoming a union apprentice.  In early 1997, he began his own construction business, L.M. Farina & Sons Custom Building Co. (the "Company").[4]  The Company did remodels, additions and new construction in the LBI – Manahawkin, New Jersey area.  He testified that his business was cyclical and his annual income varied.  He had a good relationship with local architects and received job referrals through word-of-mouth advertising.  He maintained an A+ rating with the Better Business Bureau.

Farina testified that he believed 2013 and 2014 to be his highest income years.  He had completed construction of a new, nearly 19,000 square foot home in Lovelades in 2012, a project estimated to have cost in excess of $3 million dollars (the "Rolnick Project").

---

[3] The post-trial briefing process left much to be desired.  The parties were unable to comply with either formal or informal deadlines and made numerous requests for extensions based upon other work, vacations, and medical issues which seemingly arose after already established deadlines had passed.  This Court attempted to take a permissive approach to allow for the development of the parties' arguments.  The parties, who are both represented by seasoned attorneys, stretched that allowance beyond any reason.  Even after being granted an extraordinary time to file briefs, those docketed were incomplete.  Christman's initial brief contained a table of authorities "to be provided" and numerous citations to the record also "to be provided."  The court received no follow up.

[4] Though the contractual relationship appeared to be between the Company and Christman, at no point did Farina submit that he did not have any personal obligation on the claim.  One of the expert reports submitted into evidence by Christman contained an analysis of a theory of alter ego, presumably with the intent of piercing the corporate veil.  This was not developed at trial.  Because Farina has not raised the issue the Court will consider the matter of his personal liability to be conceded.

Around that 2013-2014 time-period, Christman was looking for a contractor to work on a property he owned in LBI.  Christman testified that he admired the work done on the Rolnick Project.  He stated that he knew and respected the architect who designed the Rolnick Project, as the architect was a "high-end architect up in Somerset County," where Christman owned a home.  After learning that Farina was the builder on the Rolnick Project, Christman reached out to Farina regarding his own upcoming project.  Farina told Christman that the Rolnick Project was the largest house in his building portfolio and had taken approximately 13 months to complete.  He stated that he and the architect who designed the Rolnick property had a good relationship such that the architect had offered Farina more work in northern New Jersey.

Christman testified that based on this information, he asked Farina to submit a bid on the building project Christman planned to undertake at his LBI property (the "Project").  Christman obtained two other bids.   All bids were based upon architectural specifications (the "Specifications") produced by Craig W. Brearley, A.I.A. and dated January 15, 2014.  (Defendant's Exhibit 13).[5]  The Specifications stated that a bidder "may be required to furnish evidence satisfactory to the Owner that he and his proposed subcontractors have sufficient means and experience in the types of work called for, to assure completion of the Contract in a satisfactory manner."  He testified that two other contractors submitted bids of approximately $1,000,000.00 and approximately $800,000.00.  By letter dated February 6, 2014, Farina bid $749,850.00 to complete the Project as outlined in the Specifications. (Plaintiff's Exhibit 9).    According to Christman, in the letter Farina sent along with his bid, Farina stated that he "guarantee[d]

---

[5] The parties submitted numerous exhibits at trial, to which the Court assigned numbers in chronological order based on the timing of their introduction.  Despite being asked to do so, the parties never submitted a consolidated list of exhibits.  Therefore, the Court will reference the exhibit numbers used by the Parties.

[Christman] will be pleased not only with our approachable demeanor, but also with our exacting

tolerances in the whole process of construction . . . we seek to turn clients into friends."

An addendum to the February 6th letter, dated March 21, 2014, increased the contractual

sum to $754,005.00 (the "Addendum"). (Defendant's Exhibit 12). The Addendum included a

breakdown of costs associated with the Project, contemplating an eleven-month duration for

construction. It further detailed the payment schedule for the Project. Another letter from Farina

to Christman, dated March 22, 2014, more fully outlined the phases of construction covered by

each progress payment. (Defendant's Exhibit 14). Christman testified that, based upon the

wording of these documents, he assumed that the payments he made to Farina would be used

exclusively for the Project, with the progress payments used to cover the costs of materials and

phases of construction as outlined in the March 21st and 22nd addenda. He also relied on the job

or supply descriptions provided by Farina on his invoices. (Defendant's Exhibits 15, 16, 17, 18,

and 19). Christman admitted, however, that the documents did not contain an explicit requirement

that Farina dedicate progress payments to specific materials or phases. He also admitted that he

did not discuss how payments would be applied with Farina prior to signing the Contract.

Christman signed the Addendum on March 23, 2014. The Addendum, the February 6th

letter and the March 22nd letter, composed his contract with Farina (collectively, the "Contract").

(Defendant's Exhibit 12, Plaintiff's Exhibit 9, and Defendant's Exhibit 14, respectively).

Christman claimed that he did not hire Farina simply because he submitted the lowest bid. Farina

also gave him the shortest estimate of time for completion of the Project. Christman testified that

he had confidence in the time estimate because he knew Farina had finished the Rolnick Project,

a much bigger job than Christman's, in a short period of time. Christman explained he was

uncomfortable with the second highest bidder because the bidder was a neighbor and friend and

he did not want potential problems with the Project to affect their friendship.  In making his decision, Christman testified that he relied on representations made in the Contract and that he trusted Farina to provide "high quality construction" as promised in the bid letter.  He did not request proof of Farina's financial condition despite his explicit right to do so as set forth in the Specifications.

While Christman testified that he thought that Farina "had intentions of completing the job," he stated that he was unaware of Farina's financial condition at the time he entered into the Contract.  Christman's expert, Lunden, submitted two expert reports as to Farina's financial condition.  Lunden testified that Farina was insolvent at all times from December 31, 2013 through his bankruptcy filing, including the time period in which he bid on the Project and entered into the Contract.   His report outlined that, as of December 31, 2013, Farina was insolvent by approximately $20,000.  Lunden further testified that, to take on the Project and prove successful, Farina needed $250,000 of his own capital.  He noted that Farina's 2013 tax returns showed available cash of only $3,150 with $127,000 in accounts receivable as of that date.  Additionally, Farina had been placed on a "credit hold" by Universal Supply, one of his major suppliers before he entered into the Contract.  According to Christman, had he known of these factors, he would not have proceeded with Farina.

Christman and Farina both testified to problems that they faced during the course of the Project.  Christman testified for two days.  His frustration with Farina was palpable.  Christman complained that Farina failed to consistently show up at the jobsite, that he was difficult to contact, that he was always coming up with excuses.  He met Farina in February 2014, expecting that the Project would be completed in eleven months at a cost of $750,000.00.  By July 2015, seventeen months after the Contract was signed, the Project was still not completed.  Christman testified that

he had a number of successful experiences as an owner on other construction jobs and claimed that he had never worked with a contractor as difficult as Farina.

Farina testified to the opposite, that he had never worked for an owner as difficult as Christman. He explained many unanticipated problems that led to delays and cost overruns over which he had no control. He testified to issues such as the need for specialty steel work involving the fireplace that was not included in the specifications which caused additional delays; timing problems with the availability of subcontractors that resulted in schedule delays that, in turn, affected cost efficiency; changes in materials and in certain designs requested by Christman involving siding and windows that contributed to delay and cost; and the mis-ordering of windows by Universal Supply that caused a work stoppage. Farina noted that, despite the fact that Universal Supply delivered windows that could not be used on the Project, he made a partial payment of $10,000 to the vendor. He did not intend to make full payment until the correct windows were delivered. Many months passed before the proper windows were delivered and, by that time, the Project was way off schedule. According to Farina, Christman did not seem to want to work with him to address the problems that arose. Farina testified that, in the near twenty years he had been a builder, he had always worked together with the owner and architect to solve any problems that arose and that he had never failed to complete a job.

Farina testified to problems that arose in 2014 with his then 22-year marriage such that, by the end of that year, he was no longer living with his wife and three sons. He was involved in a costly divorce throughout 2015 and was suffering from depression. He claimed he shared his troubles with Christman but received no expression of understanding. According to Farina, he did not share his personal issues with Christman to excuse delays, but to encourage patience.

In December 2015, the Somerset County Sheriff's Office served Christman with a levy on a judgment for $130,795.89 obtained by Universal Supply against Farina.[6] (Plaintiff's Exhibit 6). As a result of the levy, Christman learned that the funds he had paid to Farina, which he assumed were to be used to pay Universal Supply for windows to be installed at the Project, were never paid to Universal Supply. Christman retained counsel, terminated Farina and retained a new contractor, William Brower, to complete the job. By that time, he had paid Farina approximately $650,000.00 and his home was not yet livable. Brower completed the job in approximately eight and a half months. Christman paid Brower $299,700.00 for his work, though Brower testified that he believed Christman spent an additional $150-160,000.00 in other work on the house.

## LEGAL CONCLUSIONS

### 11 U.S.C. § 523(a)(2)

Section 523(a)(2) of the Code operates to deny discharge of a debt fraudulently obtained. That section provides:

(a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this  title does not discharge an individual debtor from any debt -

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

(B) The use of a statement in writing-

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

---

[6] Universal Supply never enforced the levy against Christman.  He was not required to pay anything to Universal Supply.

(iv) that the debtor caused to be made or published with the intent to deceive.

11 U.S.C § 523(a)(2).

Sections 523(a)(2)(A) and (B) are "mutually exclusive and require different elements of proof." Goodman v. Kleiman (In re Kleiman), 2007 WL 1480716, at *4 (Bankr. D.N.J. May 18, 2007), *aff'd*, 2008 WL 302388 (D.N.J. Jan. 30, 2008). Where the purported misrepresentation relates to the debtor's financial condition a writing is required to prevail under § 523(a)(2). *See* Lamar, Archer & Cofrin, LLP v. Appling, 138 S.Ct. 1752 (2018); Field v. Mans, 516 U.S. 59 (1995); In re Carless, 2012 WL 32700 (Bankr. D.N.J. Jan. 6, 2012).


11 U.S.C. § 523(a)(2)(B)

As a threshold matter, Christman is unable to support a claim under § 523(a)(2)(B) because he is unable to produce a writing provided by Farina which relates to Farina's financial condition. Christman believes that the Contract constituted the requisite writing. But none of the documents that compile the Contract speak to the financial condition of Farina or his business. Instead, they speak to the specifics of the particular project. Christman has provided no caselaw where a contract is deemed to satisfy the writing requirement, and his position is rejected on its face.

In the alternative, Christman takes the position that the Specifications were a written representation regarding Farina's financial condition in that they provided that he "may be required to furnish evidence satisfactory to the Owner that he and his proposed subcontractors have sufficient means and experience in the types of work called for, to assure completion of the Contract in a satisfactory manner." Lunden's first report furthered this idea, stating that "[t]he AIA specifications dated January 15th, 2014 include a representation that Farina had the means to complete the project but this representation is inconsistent with the actual financial condition of

the firm in December 31, 2013."  (Plaintiff's Exhibit 3).  But any reliance upon the Specifications is misplaced.  The language of the clause in question contained the permissive statement that Farina "may be" required to provide information to Christman.  It is uncontested that Christman requested no such information.  When pressed on this point at trial, Lunden testified that it was his "general recollection" that there was a representation about Farina's ability to complete the work included in the contract, but that he could not find such a provision at that moment.  He was unable to provide any additional basis for the statement that the Specifications or Contract contained any such representation.  This Court has found nothing in the record which would support this allegation.  Even to the extent that Farina was bound by the terms of the Specifications through his submission of the bid, it was clear that he had no affirmative duty to provide financial information. With no writing there can be no liability under this subsection.

Finally, Christman posits that, even if the Contract or Specifications do not meet the definition of a writing respecting Farina's financial condition, the failure of Farina to provide his financial information constitutes an omission of a material fact.  The crux of his argument relates to the belief that Farina knew or should have known that he was insolvent and had a duty to disclose that fact to Christman.  That argument relates more specifically as to Farina's fiduciary duty under 11 U.S.C. § 523(a)(4) and will be discussed in more detail in that section.  But as applied to § 523(a)(2)(B), such argument is misplaced.    While the Third Circuit has recognized that "'[b]ankruptcy courts have overwhelmingly held that a debtor's silence regarding material fact can constitute a false representation actionable under section 523(a)(2)(A)," that holding is limited to § 523(a)(2)(A).  *See* In re Docteroff, 133 F.3d 210, 216 (3d Cir. 1997), *citing* In re Van Horn, 823 F.2d 1285, 1288 (8th Cir. 1987).  Christman has provided no similar caselaw holding that, in the absence of any writing, an omission relating to financial information can nonetheless support a

11

cause of action under this § 523(a)(2)(B). The plain language of the statute precludes such a finding. Section 523(a)(2)(B) is clear. A "statement in writing" respecting the debtor's "financial condition" which the debtor "caused to be made or published" is required. Such a writing does not exist here and Christman fails to prove a claim under § 523(a)(2)(B).

<u>11 U.S.C. § 523(a)(2)(A)</u>

Christman fairs no better under § 523(a)(2)(A) than he does under § 523(a)(2)(B). To prevail on a claim under § 523(a)(2)(A), the plaintiff must prove that (i) the debtor obtained money, property or services through a material misrepresentation; (ii) the debtor, at the time of the transaction, had knowledge of the falsity of the misrepresentation or reckless disregard or gross recklessness as to its truth; (iii) the debtor made the misrepresentation with the intent to deceive; (iv) the plaintiff relied on the representation; and (v) the plaintiff suffered loss, which was proximately caused by the debtor's conduct. *See* <u>De La Cruz v. Cohen (In re Cohen)</u>, 185 B.R. 180, 186 (Bankr. D.N.J. 1995), *aff'd* 191 B.R. 599 (D.N.J. 1996), *aff'd* 106 F.3d 52 (3d Cir. 1997); *aff'd* 523 U.S. 213 (1998). The burden lies with the creditor to prove each element by a preponderance of the evidence. *See* <u>Grogan v. Garner</u>, 498 U.S. at 291.

The Third Circuit has "acknowledge[d] that because a debtor will rarely, if ever, admit that deception was his purpose, [intent to deceive] is extremely difficult for a creditor to prove by direct evidence." <u>In re Cohn</u>, 54 F.3d 1108, 1118 (3d Cir. 1995). "The intent to deceive can be inferred from the totality of the circumstances, including the debtor's reckless disregard for the truth." <u>Id.</u> at 1118-19. Reckless conduct can be defined as "unreasonable conduct in disregard of a known or obvious risk from which it is highly probably that harm would follow . . . It is usually accompanied by a conscious indifference to the consequences. In contrast, negligence is

characterized as mere thoughtlessness or inadvertence or simple inattention." In re Woolley, 145
B.R. 830, 834 (Bankr. E.D.Va. 1991).

Here, the primary basis for the claim is that Farina failed to disclose the insolvency of his
business, misleading Christman into entering into the contract. But § 523(a)(2)(A) is limited to
fraud "other than a statement respecting the debtor's or an insider's financial condition." There
can be no fair ground of doubt that the allegations regarding insolvency and the health of the
business directly relate to Farina's financial condition. For that reason, § 523(a)(2)(A) cannot
apply as to the theory that Farina's financial difficulties form the basis for a claim.

A related but more nuanced argument is that Farina's failure to disclose that he was not
utilizing Christman's payments solely for labor and materials on the Project constituted a false
representation of a material fact through silence. See In re Docteroff, 133 F.3d at 216. Chrisman
relies heavily upon the Docteroff case in his argument for non-dischargeability. The debtor in that
case, Norman Docteroff ("Docteroff"), was a director and officer of a boatbuilding company
("Tacoma") that purchased Burger Boat Company, Inc. ("Burger") two months before Burger
entered into a $4.5 million contract with Bert Wolstein to build a 105-foot luxury yacht. See 133
F.3d at 213. Tacoma then established United Shipbuilding Company of America, Inc. ("USA"), a
holding company, to own the stock of Burger. See id. "USA had no revenues or operations and
merely owned the Burger capital stock." Id. Docteroff loaned $3 million to USA, which USA
used to pay the cash portion of the price of the Burger stock. See id. Docteroff loaned additional
millions to USA and obtained a security interest in all of Burger's assets, a pledge of USA's Burger
stock, and a mortgage on some of Burger's real property. See id. USA paid $70,000 each month
to repay the Docteroff loan. See id. USA used the progress payments made by Wolstein to Burger
for the building of Wolstein's luxury yacht to make payments to Docteroff. See id. The court

there found that Docteroff's failure to disclose this was sufficient to properly plead fraud in the complaint.  *See* 133 F.3d at 216.

In re Docteroff is distinguishable for a number of reasons, which will be discussed in the applicable analysis sections of this decision.  Specific to the issue of whether Farina's failure to disclose material information constituted fraud, Docteroff is distinguishable in that the opinion notes that the complaint alleged a duty to disclose the use to which progress payments made in the construction project would be put, which the Third Circuit found was sufficient to survive a motion to dismiss for failure to state a claim.  *See* id.  Because the lower court in the Docteroff case entered a default judgment on the complaint, the allegation of a duty to disclose the use of the funds became a finding of fact of the default judgment.  *See* 133 F.3d at 212 and 213.  There is no such finding here.  In fact, this Court finds no duty to disclose.

The facts here are completely different that those in Docteroff.  That case did not involve a sole proprietorship/single member limited liability company/sole member subchapter S construction company in which the sole member/shareholder performed the labor that generated the company's only revenue, as was the case with Farina.  It appears that Docteroff was a financier and stakeholder in a number of companies, not a laborer with a solely owned business.   The financial scheme in Docteroff went far beyond what occurred in the present case, where Farina was operating in the established, ordinary course of his business.

Both Farina and Christman agree that they never discussed escrowing or earmarking Christman's payments for the Project.  Farina testified that his standard practice was, and had always been, to deposit all payments he received from his clients into a general fund from which he would pay his vendors and subcontractors.  It had never been his practice to dedicate payments made by a client for use only on that client's job.  The testimony of William Brower, the contractor

Christman hired to finish the Project, supported Farina's failure to escrow Christman's funds for the Project. Brower testified that he also deposited Christman's payments into his general account. He explained that, like Farina, he put all payments he earned on jobs into a general account and used the general account to pay all his bills, just as Farina had done.[7] This record demonstrates that there was no misrepresentation relating to the use of the payments.

But, Christman advances other grounds under this section, based generally on the idea that because Farina knew or should have known of his deteriorating financial picture, he did not intend to complete the work because he did not have the means to do so. This argument comports with much of the caselaw surrounding non-dischargeability of a claim between a contractor and client. As a court in this district has recently noted:

> In cases involving a debtor-contractor, such as the case presently before this Court, courts in this Circuit have generally recognized "two ways to establish misrepresentation or fraud under section 523(a)(2)(A): (1) to show that the contractor executed the contract never intending to comply with its terms, or (2) to demonstrate that the contractor intentionally misrepresented a material fact or qualification when soliciting the work."

*See* Molz v. Price, 613 B.R. 599, 604 (Bankr. D.N.J. 2020) (internal citations omitted).

Farina credibly testified that he had every intention of completing the Project when he entered into the Contract and continued to believe he could finish throughout the time he worked on the Project, despite the difficulties that presented themselves. He had never failed to finish a job and knew his reputation was at stake. He sold equipment and took side jobs to support his work on the Project. Most importantly, on cross-examination, Christman also stated that he believed Farina had every intention of completing the Project at the time the Contract was signed.

---

[7] Brower also testified about damages Christman claimed he suffered as a result of Farina's work (or lack thereof). The Court need not discuss this testimony as it finds that any liability on Farina's part is discharged.

It was clear from the testimonies of both men that Farina had no intent to defraud Christman. This should be the end of this Court's inquiry.

But Christman raises a number of issues that he argues proves Farina's fraudulent intent. Many involve the fact that Farina did not tell Christman that he was insolvent before Christman entered into the Contract. But Farina credibly testified that he was not aware he was insolvent. Instead, he testified that he believed the year before he met Christman was the most profitable year he had ever had.

Christman was unaware that, one month before he signed the Contract, Universal Supply had placed a hold on Farina's credit. Christman testified that, if he had known this, he would never have signed the Contract. Although not clearly argued by Christman, the Court supposes an existing credit hold should have alerted Farina to, at least the possibility of, his own insolvency.

Diane Falconiero, an employee of Universal Supply, testified that she began working on Farina's account with Universal Supply in 2014 and identified the "Credit Note Pad Listing" that outlined conversations between Universal Supply and Farina or one of his employees dating back to 2005. (Plaintiff's Exhibit 1). The Credit Note Pad Listing outlined a ten-year history of late payments, negotiations for product pending payments, notations that Farina was having difficulty collecting from customers, etc. The Credit Note Pad Listing made clear that Farina had been placed on credit hold on prior occasions but had always been able to remedy the hold. Falconiero testified that Universal Supply works with more than 100 contractors, all of whom have ups and downs with their ability to pay for supplies. She noted that Farina was always responsive to her and that he always made good on his obligations until 2015. While it was clear that Falconiero did not have the authority to extend or revoke credit, she testified that based on her experience, if

Farina had been able to pay what he owed in 2015, Universal Supply would have continued doing business with him, just as it had for the prior ten years.

Falconiero's testimony minimizes the effect of the credit hold on Farina's account immediately prior to entering into the Contract.  The Court sees the credit hold as a typical event in Farina's business dealings and one that would not alert him to his own insolvency.   Universal Supply continued to provide materials to Farina long after he entered into the Contract with Christman.  According to Farina, a significant part of his final inability to pay his debt to Universal Supply, was Universal Supply's failure to provide the correct windows for the Project.

It is also important to note once again that, despite the fact that the Contract gave Christman the right to inquire as to Farina's financial health, Christman never asked for that information. Farina had no duty to disclose information about his finances.

There is simply no evidence that Farina never intended to perform the work.  As discussed, by Christman's own admission he does not believe that it was Farina's intention not to perform. Farina worked on the Project for over seventeen months before being dismissed and, according to William Brower, performed work valued at approximately $426,000.  This does not comport with a debtor who had no intention of complying with a contract.

Nor is there evidence of Farina misrepresenting a fact or qualification when soliciting the work.  As discussed, any misrepresentations or omissions regarding Farina's financial condition were not in writing and § 523(a)(2)(B) cannot apply.  As to Farina's qualifications, Christman testified that Farina's "brag book" and his work on the Rolnick Project factored heavily into his decision.  The project was larger than Christman's and demonstrated that Farina had the capability and skill to perform the work.  The only other evidence in the record which Christman introduces in support of a purported misrepresentations by Farina during the solicitation process is the letter

through which Farina "guarantee[d] [Christman] will be pleased not only with our approachable demeanor, but also with our exacting tolerances in the whole process of construction . . .  we seek to turn clients into friends."  But "contractor's general representations regarding his expected work performance and the actual quality of that workmanship do not qualify as misrepresentations for purposes of section § 523(a)(2)(A)."  In re Purington, 2012 WL 1945510 *10 (Bankr. D.N.J. May 30, 2012).

Christman noted that he later learned Farina had a different payment arrangement with the Rolnicks.  Farina agreed that the Rolnicks could pay for materials and subcontractors directly, which insured that the money paid by the Rolnicks went directly to fund the Rolnick Project. Christman claimed Farina should have offered the same payment arrangement to him.  But Farina had no obligation to do so.  Farina testified that the payment process for the Rolnick Project was a deviation from his regular practice.  The Rolnicks asked Farina to agree to their direct pay process after he had begun work.  According to Farina, the Rolnicks suggested the direct pay arrangement to help Farina reduce his costs as he would not have to purchase insurance for his subcontractors if they were paid directly by the owner.

Christman asks for an "adverse inference" from the different payment terms.  But an adverse inference is drawn from silence, or the absence of requested evidence.  Here there was direct testimony on the issue in which Farina credibly testified as to the reasons for the different treatment.

Farina also noted that the Rolnick Project, which had so impressed Christman, was a totally different kind of construction project.  The Rolnick Project was all new construction, while the Christman Project was a large renovation in which portions of the existing structure were

preserved.   According to Farina, the latter type of project is much more likely to present unpredictable obstacles.

For these reasons there can be no finding of non-dischargeability of Christman's claim under 11 U.S.C. § 523(a)(2)(B).


   11 U.S.C. § 523(a)(4)

Section 523(a)(4) excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.   *See* 11 U.S.C. § 523(a)(4).   Bankruptcy courts have grappled with the meaning of "acting in a fiduciary capacity" under the statute.   As one court noted:

> The determination requires consideration of three (3) sources that bankruptcy courts consult in rendering decisions in § 523(a) proceedings: (1) the facts regarding the nature of the relationship between the debtor and the creditor; (2) the treatment of the debtor-creditor relationship under applicable nonbankruptcy law; and (3) historic bankruptcy dischargeability policy under § 523(a)(4). These sources may push and pull a court in different directions.

In re Bayer, 521 B.R. 491, 505 (Bankr. E.D. Pa. 2014).   Ordinarily, a fiduciary relationship is established through an express or technical trust, or through state law.   *See* In re Guarracino, 575 B.R. 298, 310-11 (Bankr. D.N.J. 2017) (collecting cases).   The term fiduciary capacity has a narrower meaning in bankruptcy than common law and is not intended to apply to ordinary commercial or contractual relationships.   In re Bayer, 521 B.R. at 505-06.   Christman posits that under the applicable non-bankruptcy law, in this case New Jersey state law, directors of an insolvent corporation owe a fiduciary duty to creditors.   *See* Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 173 (3d Cir. 2002), *citing* AYR Composition, Inc. v. Rosenberg, 261 N.J.Super. 495, 501, 619 A.2d 592 (App.Div.1993).

But, as explained by the <u>Bayer</u> court:

> the mere fact that the parties' relationship may have some of the characteristics of a fiduciary relationship under state law, does not necessarily mean that the relationship is a fiduciary one under § 523(a)(4). The Seventh Circuit has stated this general principle directly: "Not all persons treated as fiduciaries under state law are considered to 'act in a fiduciary capacity' for purposes of federal bankruptcy law."

<u>In re Bayer</u>, 521 B.R. at 506.

There is a split of caselaw applying § 523(a)(4) to the general New Jersey state law fiduciary duty on directors of insolvent corporations. Here, again Christman relies most heavily upon the <u>In re Docteroff</u> case, where the Third Circuit found Docteroff's actions in transferring funds from an insolvent corporation to himself violated § 523(a)(4). In another case where a debtor appropriated the assets of an insolvent corporation to a new corporation, a bankruptcy court in this district similarly found that the adversary complaint stated a cause of action under § 523(a)(2)(A). *See* <u>In re Carretta</u>, 219 B.R. 66 (Bankr.D.N.J.1998). But those cases involved a default judgment in the case of <u>Docteroff</u> and a motion to dismiss in <u>Carretta</u>. Neither court had the benefit of a fully developed factual record from which to make a determination as to a fiduciary duty.

This Court is persuaded by Judge Lyons' analysis in the case of <u>In re Casini</u>, 307 B.R. 800 (Bankr. D.N.J. 2004). In that case the debtor controlled several unsuccessful businesses with the purpose of designing, manufacturing, and selling boats. <u>Id.</u> at 806. The creditor entered into a contract to repair a boat with one of the debtor's companies. <u>Id.</u> Despite paying two installments under the repair contract, the repairs were never completed and the creditor obtained a default judgment against the company. <u>Id.</u> at 806-07. During post-judgment discovery the creditor learned that the debtor's company "had ceased doing business, that it never made a profit, that it had numerous warranty claims and judgments, and that its only assets were some obsolete molds which were available." <u>Id.</u> at 807. Despite being in control of the insolvent corporation, and

noting the holdings of <u>Docteroff</u> and <u>Carretta</u>, Judge Lyons nonetheless found that the debtor did

not fit the definition of a fiduciary.  As he cogently explained:

> Viewing the phrase fiduciary capacity in context with executors, trustees
> and public officials, the quality or characteristics of the position of corporate
> director is more akin to the agent in <u>Chapman v. Forsyth</u> than a trustee of
> an express trust. Also, in terms of creating an exception to discharge that
> would likely sweep in too many debtors deserving a fresh start, treating a
> corporate director as acting in a fiduciary capacity would expose many
> owners of closely held companies to claims of nondischargeability by the
> creditors of their failed enterprises. After all, the failure of a small business
> is usually accompanied by the bankruptcy of the individual owners who
> have staked their fortunes on the success of their business and may have
> guaranteed a large part of the corporate debt. To treat them as the type of
> fiduciary covered by § 523(a)(4) exposes them to harassment by all
> corporate creditors who would have the bankruptcy court second guess
> every decision by the managers of a declining business.

<u>Id.</u> at 818 (citing to <u>Chapman v. Forsyth</u>, 43 U.S. 202 (1844)).  This echoes many of this Court's

concerns in applying Christman's theory to the facts of this case.   The Court again notes that

Farina never challenged his individual exposure by relying on corporate protections.  Farina is

clearly an individual owner who staked his fortunes on the success of his business.  There is

precious little guidance on how a court should balance the unique issues presented by small, sole

proprietor businesses with the general rule regarding the fiduciary duties of directors of insolvent

companies.   For instance, a strict interpretation of Christman's position could result in a finding

that a fiduciary duty arises at the time of insolvency, regardless of the director's actual or

constructive knowledge of such insolvency.   Such an interpretation would be completely

inconsistent with the Bankruptcy Code, and the Court can find no such example of its application.

Even accepting the director's knowledge of insolvency as the point where a fiduciary duty arises

is problematic in the context of small businesses.  Often, the owners of these businesses lack any

accounting expertise to make an informed determination as to solvency.  Additionally, small

businesses may experience periodic declines in business or be affected by larger economic

downturns and market conditions.   At what point does it become the duty of the sole proprietor/single member/sole shareholder to "give up" rather than "make it work"?  There are no easy answers to these questions.

While Lunden's second report determined that Farina fit the definition of a fiduciary, such a legal conclusion was well outside the scope of his expertise.  It is for this Court - and not Lunden - to decide whether Farina should be considered a fiduciary, based on the admissible testimony and evidence.  The first of Lunden's two expert reports addressed insolvency and damages.  It did not mention any breaches of fiduciary duty, or misappropriation of assets.  He prepared his second report approximately three years later, after Christman's attorney provided him with a copy of In re Docteroff, among other cases.  In the second report, Lunden expanded his earlier report by concluding that Farina was a fiduciary based on the caselaw he had read.  (Plaintiff's Exhibit 4). He prepared his report from the perspective that Farina had fiduciary duties to Christman because of Farina's insolvency.  But, as demonstrated by the applicable caselaw, such a simplistic analysis is insufficient for a finding that a debtor is a fiduciary.  Lunden is not an attorney.  He was provided with a limited universe of caselaw which supported Christman's position.  There is no evidence that he sought to perform any additional research on the issue.

For these reasons, Lunden's opinion that because Farina was insolvent he had a duty to disclose his financial condition is wholly inappropriate and is rejected.  In this case, Farina was not contractually required to disclose his finances.  Christman was given the opportunity to investigate Farina's insolvency and he failed to do so.

Lunden's testimony as to the issue of Farina's insolvency at the time the Contract was signed and during the time the work was being performed is more appropriately considered. Lunden testified that Farina was insolvent as of December 31, 2013 based upon the limited

available cash of $3,150.00 coupled with the accounts receivable of $127,000.00.  Lunden testified

that in order for Farina to complete the Project, Farina would need to show working capital in the

amount of $250,000.00.  Farina did not provide an expert to refute Lunden's opinion that Farina's

business was technically insolvent as of the end of 2013.

But Lunden's testimony did not establish that Farina would have knowledge of his

insolvency until well after the execution of the Contract.  He initially testified that Farina had no

reasonable basis to expect to be able to earn his way out of insolvency by at least December 31,

2014.  But Christman had already made approximately $523,304 in payments at that point; an

amount which was approximately 80% of the total paid.  In addition, by the end of 2014 Farina

had disclosed to Christman via text message that he was having financial difficulties, though it is

unclear whether he knew that his company was insolvent.  Lunden admitted that he did not know

the answer to the question of whether Farina should have reasonably known he was insolvent prior

to the end of 2014.    The Court generally questions Lunden's expertise to opine as to when a

contractor should have reasonably been aware of the fact of his insolvency.  He is an accounting

expert and does not necessarily have knowledge of whether a general contractor with limited

accounting background should have knowledge of insolvency.  Brower, who is more familiar with

the intricacies of running a small contracting business, could have provided additional context as

to what is reasonable for a general contractor in relation to the knowledge of a company's financial

well-being.  However, he was not questioned as to how he measured the financial well-being of

his own business.

In his own defense, Farina testified that in January 2013, prior to entering into the Contract,

he was able to pay his bills and believed his business was "as good as [it] could be," similar to

what it had always been.  When shown his tax returns, Farina could not explain many of the entries.

It was clear to the Court that Farina had always relied on his office assistant and his accountant to handle the finances of his business. Farina credibly testified that it was not until Christman terminated the Contract that Farina began to realize he could not continue with his business. According to Farina, the market for construction had shrunk and he was not in a "head space to sell" due to his divorce and the depression that accompanied it. But he testified that at the time he entered into the Contract he had no reason to believe that he would be out of business in 2016.

When Farina was questioned about Lunden's opinion regarding the amount of working capital necessary to complete the Project, Farina disagreed but candidly admitted that he had no opinion as to whether Lunden was correct. Farina explained that in his experience with 15 to 20 of his fellow contractors on LBI, no one held working capital and that, in fact, he had never heard of the term. It is notable that Brower, Christman's expert witness, was not questioned as to his working capital prior to taking on the completion of the Project. While Christman's attorney asked Brower if his company was insolvent at any time from formation to working on the Project, there were no follow up queries establishing how he came to his conclusion, or if he generally knew that he needed a specific amount of working capital to bid on any project, or if he had any knowledge of how much would be needed to complete the work. Brower further testified that he was never asked for financial information form Christman prior to his work on the Project.

Lunden testified that the inability to pay Universal Supply should have been a "red flag," but he did not go so far as to state that a layperson would have known of their insolvency at that point. But, as discussed, credit holds were not unusual for Farina or for other contractors who purchased materials from Universal Supply. It is not clear when Farina realized he could not pay Universal Supply for the windows. He reasonably decided not to pay Universal Supply until the correct windows were delivered. He could not have predicted that it would take more than six

months to receive the correct delivery.  In the meantime, the delay caused work stoppage and severe disruption in the timing of the construction, which resulted in further losses to Farina.  He took on other projects to sustain his business.

If Farina should have known he was insolvent when he could not pay Universal Supply for the windows ordered for the Project, his knowledge of insolvency still would have arisen well after execution of the Contract.  Further, as Farina credibly testified, even then he believed he would complete the Project as he had always been able to finish projects for the prior twenty years, despite existing credit holds.  The Court finds that, by the time Farina likely realized, or should have realized he could not pay for the windows, he had already received approximately 80% of the funding of the Project from Christman.  Once again this illustrates the difficulties in ascribing a fiduciary duty to a sole proprietor.  Was he to quit the Project and walk away, or continue to try and salvage the Project?  It was in the latter choice that he had always found success, and it was the latter choice he made here.

Christman was faced with a similar dilemma.  He testified that when Farina texted him regarding his financial difficulties in Winter 2014, he did not fire him because he felt that after the time and money expended, he needed to get the Project done through Farina.  And Farina, recognizing those same pressures, felt that his duty was to honor the terms of the Contract.  To be saddled with a large, non-dischargeable claim based upon Farina's efforts to fulfill his obligations would be inequitable.

The Court finds that Farina was not a fiduciary pursuant to the Code.  But acknowledging the split in caselaw and the complexities in defining "fiduciary" under § 524(a)(4), the Court will also analyze whether Christman would prevail even in the event that Farina could be considered a fiduciary.

Fraud and Defalcation

(i)    Fraud

"Fraud for the purposes of section 523(a)(4) is the same as is required for purposes of section 523(a)(2)(A)."  In re Russo, 2019 WL 117469, at *22.  The parties did not specifically address whether § 523(a)(4) may be used to evade the writing requirement for a statement regarding the debtor's financial condition.  The language of § 523(a)(4) does not appear to require a writing for a finding of fraud in such an instance.

Ultimately, this Court need not reach a conclusion on the question because Christman cannot prevail under this section.  The overarching theory of the case is that Farina's failure to disclose his company's insolvency constituted a fraudulent misrepresentation.  But as has been discussed throughout this opinion, the Court finds that Farina did not have any knowledge of the insolvency when he entered into the Contract.  At the earliest, Farina began to recognize his financial difficulties towards the end of 2014.  Importantly, he disclosed these problems to Christman via his text message in Winter 2014.  He did not use the magic word "insolvency," but he was upfront in the message, stating "I'm doing what I can to keep my business afloat and finish your project . . . I am dreadfully behind in my bills and my schedule on account of many different reasons . . . in truth, I underbid your project and I am doing my best to make its completion happen."  (Plaintiff's Exhibit 8).  He continued "I am under a tremendous amount of financial stress and I am forced to take on work – on other work to complete your project . . . I have been doing my best to keep everything regarding my company afloat . . . I can only promise you I am working behind the scenes as hard as I can to right these issues."  This text message aligns with Farina's testimony that he was attempting to make it work.  This Court does not see Farina as an

individual who was knowingly omitting information regarding his financial picture.  There is no misrepresentation to support a finding of fraud while acting in a fiduciary capacity.

(ii)    Defalcation

Defalcation can be distinguished from fraud and embezzlement, as it can be applied to nonfraudulent breaches of fiduciary duty.  *See* Bullock v. BankChampaign, N.A., 133 S. Ct. 1754, 1760 (2013).  Defalcation "can encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity."  Id., *citing* Black's Law Dictionary 479 (9th ed. 2009).  As an example, the Court referenced a finding of defalcation based on an unreasonable sale of assets.  *See* id., *citing* In re Frankel, 77 B.R. 401 (Bankr. W.D.N.Y. 1987).

To establish defalcation while acting in a fiduciary capacity under § 523(a)(4), a plaintiff must establish that the debtor possessed "a culpable state of mind" involving "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  Bullock, 133 S. Ct. at 1757; *see also* In re Baylis, 313 F.3d 9, 20 (1st Cir. 2002) ("defalcation requires something close to extreme recklessness").  The Supreme Court emphasized that even if a debtor's conduct does not involve bad faith or immoral conduct, the conduct giving rise to the debt must be intentional conduct.  *See* Bullock, 133 S. Ct. at 1759.  The Court included within the scope of intentional conduct "not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent."  *See* id.  That equivalency to actual knowledge exists if the fiduciary "'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk'" that his conduct will breach a fiduciary duty.  *See* id., *citing* ALI, Model Penal Code §2.02(2) (c), p. 226 (1985).

That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." [ALI, Model Penal Code], §2.02(2) (c), at 226 (emphasis added).  Bullock, 133 S. Ct. at 1759-60.

Thus, even to the extent that Farina could be considered a fiduciary, his conduct in that role does not rise to the level of extreme recklessness necessary for a finding of defalcation.  Christman argues that Farina committed defalcation because he did not use the payments Christman made pursuant to the Contract exclusively for labor and materials for the Project.  But as discussed, this was never the agreement between the parties.  This was further reinforced by Brower's testimony, which established that he also would place monies into a general fund for use.  Following his own standard practice, which was also the standard practice in his industry, can hardly be considered to be reckless behavior.

To the extent that Farina's actions in connection with his insolvency form the basis for this charge, such position is rejected.  Lunden's testimony establishes that, at best, Farina's failure to understand he was insolvent was not reasonable.  The Court has further found that any such knowledge did not arise until after the majority of the payments were made.  Even accepting that Farina's knowledge and actions were not reasonable, they clearly did not amount to the gross recklessness that would be required for a finding that Farina purportedly breached his fiduciary duty by committing defalcation by utilizing payments for non-Project purposes.

Finally, the standards of proof for embezzlement and larceny, the remaining two bases for a finding of non-dischargeability under § 523(a)(4), have not been met.

Embezzlement

Embezzlement under § 523(a)(4) has been defined as "the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come." In re Truch, 508 B.R. 616, 623 (Bankr. D.N.J. 2014), *citing* In re Fuget, 339 B.R. 702 (Bankr. S.D. Iowa 2006). To prove embezzlement, the creditor must show that the debtor appropriated the subject funds for his own benefit and did so with fraudulent intent or deceit. In re Truch, 508 B.R. at 623. No fiduciary relationship needs to be established in order to find a debt non-dischargeable by an act of embezzlement. *See* id. But the debtor must first have a lawful right to possess the later-appropriated property.

The Third Circuit in In re Docteroff, in finding that the complaint upon which judgment entered was properly pled, noted that the complaint alleged Burger received lawful payments from Wolstein that were to be used solely for construction of a yacht. *See* In re Docteroff, 133 F.3d at 217. Docteroff then "purloined that money for an improper purpose, his own personal use." Id. According to the Third Circuit, this allegation, which became a factual finding by virtue of the default judgment, was sufficient to prove embezzlement under 11 U.S.C § 523 (a)(4) and willful injury under 11 U.S.C § 523(a)(6). *See* id. Christman's offers of proof as to these elements were insufficient to support such findings in this case. He failed to establish that Farina had an obligation to use the money Christman paid him only for the Project. Clearly, Farina and Christman must have understood that some of the funds Christman paid for the Project would be used by Farina to pay his personal expenses. Farina's bid would have included an anticipated profit that represented Farina's compensation.

To the extent that Farina took too much of Christman's money for his personal use, there is no evidence that the money was appropriated with fraudulent intent. Farina's practice was to

deposit funds in a general account.  This appears to be the practice of many contractors, as confirmed by Christman's own expert, Brower.  While Christman may have established that he did not receive in-kind value for the amount of money that he paid to Farina, he did not establish that Farina was knowingly siphoning the money.  Farina was trying unsuccessfully to make the Project, and his business, work.  The evidence establishes that it was always Farina's intention to complete the project one way or another.  There is simply nothing to demonstrate the intentional deceit required for embezzlement.

<u>Larceny</u>

Larceny, the final grounds for a finding of non-dischargeability under § 523(a)(4), requires a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent.  <u>In re Truch</u>, 508 B.R. at 623, *citing* <u>In re Burke</u>, 416 B.R. 136 (Bankr.E.D.Pa.2009).  To hold a debt non-dischargeable as a larceny, a court must find felonious intent at the time of the taking.  *See* <u>id.</u>, *citing* <u>In re House</u>, 2007 WL 2126260, at *4 (Bankr.N.D.Ill.2007).  Larceny does not require a fiduciary relationship.

It does not appear that Christman is seeking relief under this theory, as it was not developed at trial or in post-trial briefing.  A review of the record would not support judgment under this section.  The payments made from Christman to Farina were consensual.  To the extent that Christman believes Farina wrongfully took the checks to for his own use when Christman only consented to their use for the Project, this theory is rejected.  For the reasons stated throughout this opinion, the Court finds no fraudulent intent and no agreement between the parties that the payments were required to be used on the Project.

<u>11 U.S.C. § 523(a)(6)</u>

Section 523(a)(6) provides that a discharge under § 727 of the Bankruptcy Code does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  A debtor's actions are willful and malicious under § 523(a)(6) "if they either have a purpose of producing injury or have a substantial certainty of producing injury." <u>In re Conte</u>, 33 F.3d 303, 307 (3d Cir. 1994).  The Bankruptcy Code requires at least a deliberate action that is intended to or is substantially certain to produce harm. <u>Id.</u> at 309; *see also* <u>Kawaauhau v. Geiger</u>, 523 U.S. 57 (1998).  Negligent or reckless conduct is not enough.

In <u>Geiger</u>, the United States Supreme Court stated, "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead 'willful acts that cause injury.'  Or, Congress might have selected an additional word or words, i.e., 'reckless' or 'negligent,' to modify 'injury.'" <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998).  At the very least, to fall within the non-dischargeability exception, the debtor must have "acted with substantial certainty that injury would result." <u>In re Elwood</u>, 319 B.R. 371, 372 (E.D. Pa. 2005).

The Eleventh Circuit Court of Appeals has defined the word 'malicious' as 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.' <u>In re Walker</u>, 48 F.3d 1161, 1164 (11th Cir. 1995).  The Fourth Circuit emphasized that there must be a consciousness of wrongdoing. <u>In re Stanley</u>, 66 F.3d 664, 668 (4th Cir. 1995).  "It is this knowledge of wrongdoing that is the key to malicious injury under section 523(a)(6), not the wrongfulness of the debtor's actions." <u>In re McClung</u>, 335 B.R. 466, 475 (Bankr. M.D. Fla. 2005).

Based upon the record at trial, the Court finds no deliberate or intentional injury by Farina. It is apparent that it was his intent to complete the Project as contracted. As stated above, he worked on the Project for over seventeen months and produced approximately $426,000 worth of value. This is a far cry from a debtor who was seeking to injure Christman. To the extent that the Company was insolvent, even if Farina should have been aware of his financial condition, his negligence (or even recklessness) in that regard is insufficient to prove a claim under this section.

> 11 U.S.C. § 727

The discharge provision of § 727 is described as "the heart of the fresh start provisions of the bankruptcy law." Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 384 (1977)). Under Fed. R. Bankr. P. 4005, the objector to a debtor's discharge bears the burden of proving her case by a preponderance of the evidence. *See* Grogan v. Garner, 498 U.S. 279, 287 (1991). A total bar to discharge under § 727 is an extreme remedy, and therefore the section is construed liberally in favor of the debtor. *See* Rosen v. Bezner, 996 F.2d at 1534; *see also* Stapleton v. Yanni (In re Yanni), 354 B.R. 708, 711 (Bankr. E.D. Pa. 2006) (denial of discharge is most severe penalty for Chapter 7 debtor). But it is also well accepted that only the "honest but unfortunate debtor" is entitled to a discharge. *See* Grogan v. Garner, 498 U.S. at 286-87.

Christman alleges that Farina should be denied a discharge based upon three (3) subsections of § 727: (a)(2) (transfer or concealment of property of the estate within one year); (a)(3) (concealment/destruction/failure to keep records); and (a)(5) (failure to explain loss of assets). These causes of action did not appear to be the focus of the litigation. They were not raised in depth in dispositive motions, at trial, nor in the post-trial filings. It appears that Christman's theory is that Farina's purported fraud also provides a basis for a general denial of

discharge under § 727.  But there has been no development or application of the facts specific to

this count.  In fact, the only specific subsection of § 727 referenced in Christman's post-trial briefs

was § 727(a)(4), a subsection which was <u>not</u> plead in the complaint.  That subsection provides for

a denial of discharge on the basis of knowing and fraudulent oaths or accounts in connection with

a bankruptcy case.  The complaint was never amended to include the specific allegations relating

to such a count, and for that reason those arguments will not be considered.

     <u>11 U.S.C. § 727(a)(2)</u>

     11 U.S.C. § 727(a)(2) provides that a debtor shall be denied a discharge if, "the debtor,

with intent to hinder, delay or defraud a creditor or an officer of the estate . . .  has transferred,

removed, destroyed, mutilated, or concealed . . . (A) property of the debtor of the debtor within

one year before the date of filing of the petition; or (B) property of the estate, after the date of the

filing of the petition."  The Third Circuit notes that a party seeking to bar discharge under this

exception must prove both an act and improper intent were present during the one-year period

before the bankruptcy.  *See* <u>Rosen v. Bezner</u>, 996 F.2d at 1531.  Because a debtor is unlikely to

admit directly that his or her actions were motivated by fraud, intent may be inferred using

circumstantial evidence or inferences drawn from a course of conduct.  *See* <u>Wachovia Bank, N.A.</u>

<u>v. Spitko (In re Spitko)</u>, 357 B.R. 272, 301 (Bankr. E.D. Pa. 2006).

     In applying § 727(a)(2), courts apply "badges of fraud," including the following: (i) lack

or inadequacy of consideration; (ii) the family, friendship or close associate relationship between

the parties; (iii) the retention of possession, benefit or use of the property in question; (iv) the

financial condition of the party sought to be charged both before and after the transaction in

question; (v) the existence or cumulative effect of the pattern or series of transactions or course of

conduct after incurring of debt, onset of financial difficulties or pendency or threat of suits by

creditors; (vi) the general chronology of the events and transaction under inquiry; (vii) whether the

transaction is conducted at arm's length; (viii) whether the debtor is aware of the existence of a

significant judgment or over-due debt; (ix) whether a creditor is in hot pursuit of its judgment or

claim and whether the debtor knows this; and (x) the timing of the transfer relative to the filing of

the petition.  Foy v. Carlbon (In re Carlbon), 2011 WL 6739507 at *3 (Bankr. D.N.J. Dec. 20,

2011).

Without the benefit of any analysis by Christman it is difficult for the Court to surmise the

basis for a judgment under this subsection.  Christman theorizes that Farina fraudulently induced

him into entering into the contract and continuing progress payments.  But those allegations do not

evidence any specific transfers or concealment of property of Farina prior to the bankruptcy filing

upon which to apply the badges of fraud.  While Farina's business may have been losing money,

there has been nothing presented which demonstrates that Farina was transferring or concealing

assets for the purpose of defrauding Christman.  With no further development at trial or analysis

in post-trial briefings, Christman has failed to meet his heavy burden under this subsection.

### 11 U.S.C. § 727(a)(3)

Under 11 U.S.C. § 727(a)(3), a debtor may be denied a discharge where he "has concealed,

destroyed, mutilated, falsified, or failed to keep or preserve any recorded information . . . from

which the debtor's financial condition or business transactions might be ascertained, unless such

act or failure to act was justified under all of the circumstances of the case."

Here, the complaint generally references a fire which destroyed some of Farina's books

and records.  But there is no indication that the fire was in any way intentional or a means to avoid

his obligations to his creditors.  It appears that there were still some records available, as Lunden

testified as to his use of the records in the preparation of his reports.  There are no other allegations

relating to this subsection.  It is unclear if Christman has abandoned this cause of action, however the failure to substantively address the requirements of the statute in any significant capacity requires a finding in favor of Farina.

<u>11 U.S.C. § 727(a)(5)</u>

Finally, 11 U.S.C. § 727(a)(5) provides:

> (a) The court shall grant the debtor a discharge unless—
>
>> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

The plaintiff has the initial burden of identifying the assets in question by appropriate allegations in the complaint and showing that the debtor at one time had the assets but they are no longer available for the debtor's creditors. <u>In re Brien</u>, 208 B.R. 255, 258 (1st Cir. B.A.P. 1997). "Whether the Debtor has responded with a satisfactory explanation is a matter for the Court's discretion. <u>In re Schafer</u>, 2010 WL 1286427, at *6-7 (Bankr. D.N.J. Mar. 31, 2010).  The court's focus "should be on the satisfactoriness of the debtor's explanation, not on the wisdom of the debtor's dissipation of the assets." <u>In re Robbins</u>, 2008 WL 2038833, at *4 (Bankr. D.N.J. May 12, 2008).

As with the other § 727(a) subsections, the lack of any application of the facts to the law makes the Court's analysis difficult.  It appears that Christman's general position is that because he gave Farina money to complete the job but the job was not completed, there should still be money available which Farina cannot account for.  But the post-trial briefs provide no specific testimony nor do they cite to any specific evidence as to this count.  Christman's theory of the case is that Farina's business was failing.  It is unsurprising, then, that the business was losing money.  Christman has failed to meet his burden here.

**<u>CONCLUSION</u>**

Perspective is important here.  Christman spent approximately $1.1 million on his beach house, a figure not far afield from the $1 million estimate he received from a contractor prior to commencing the Project.  He is now seeking a non-dischargeable claim against Farina in an amount over three times what he paid for the entire project.  To be sure, where the Bankruptcy Code directs such relief and the factors are proven, it is fully appropriate.  But a full review of this record simply does not support any finding that Farina acted with any malice or intentionality throughout this entire process.  At worst, he should have been more aware of his spiraling financial condition.  Farina was essentially a contractor working on his own trying to make his business work and trying to honor his contractual obligations while facing personal and professional challenges.  Saddling him with a non-dischargeable debt is an outcome that this Court cannot countenance.  For this reason, judgment is entered in favor of Farina.

/s/Christine M. Gravelle

Dated:  July 18, 2023                                    United States Bankruptcy Judge